LILLARD, Appellant, v. JOHNSON et al.

Division One, February 15, 1899.

Fraud: CONVEYANCE FROM FATHER TO SON: AFTER-ACQUIRED TITLE BY SON. Where a father, entirely solvent, transfers his stock and other personal property to his son in payment for four years' work, and afterwards in order to defeat his creditors conveys his farm to his wife and then he and his wife conveyed the same to his partner, to whom he owed $300, and the son for the next two years rented the farm from the partner, and when he had paid the partner $300 as rent the partner conveyed it to the son without his knowledge, and put the deed of record but did not deliver it to him, but before this, a bank had obtained judgment against the father, sold and bought his interest in the land at execution sale, and then brought suit to set aside the father's sale of the stock to the son, made (at that time) eight years before, and the son, in

accordance with an agreed settlement of the suit, sold the stock and with the money paid the father's judgment debt, and the bank conveyed to him the farm (six months before the father's partner had made the deed to the son), it will be held, in a suit by a purchaser under the junior judgment against the father, to set aside the bank's deed to the son, that the son, knowing nothing of his fraudulent intentions or declarations, and having rendered value for the stock obtained from his father, and paid a valuable consideration for the bank's debt, held a good and valid title.

*Appeal from Vernon Circuit Court.*—Hon. D. P. Stratton, Judge.

Affirmed.

M. T. January for appellant.

(1) If land be bought with the money of one and the title is taken in the name of another in fraud of the creditors of the first, a trust results which is the subject of sale on execution. (2) The fact that all the personal property and stock was assessed against Josiah's father up until the time the father undertook to cheat his creditors, shows that Josiah did not claim to be the owner of the property. (3) Josiah recognized his father as the owner of the stock when he agreed that that stock might be sold to pay his father's debt. (4) His payment of rent to Gorse showed that he knew of the fraudulent transfer of the land by his father.

S. A. Wight, J. B. Johnson and H. H. Blanton for respondents.

(1) The sale of the stock and personal property to Josiah by his father was a *bona fide* transaction, for value, and hence Josiah became the actual owner thereof. (2) The sale was made four years before the transfer by his father of the farm, at a time when the father was entirely solvent. (3) The execution in favor of the Union National Bank was a prior lien to the execution in favor of the Citizens Bank.

(4)   If Josiah was the owner of the stock, he acquired whatever title the Union National Bank had obtained at the sheriff's sale.   That title was superior to the defendant's subsequently acquired interest at the execution sale under the judgment in favor of the Citizens Bank.   (5)   Josiah never did claim under Gorse, never knew that he had made a debt to him, did not know of his father's declarations to transfer his property to cheat his creditors, and is not chargeable therewith.

MARSHALL, J.—Bill in equity to set aside conveyances of real estate, declare a resulting trust, and divest title.

Stated in the order of their sequence the facts in this case are these:   John Johnson was a prosperous farmer in Vernon county.   He had several sons, and after each attained his majority, he worked for his father for several years, and the father then started them in business for themselves.   About 1873 he gave his son William a farm, worth from eight hundred to a thousand dollars.   He gave his son J. D. Johnson some cattle and corn.   Defendant Josiah became of age in 1883, and stayed on the place working for his father until March, 1887, when his father transferred to him some horses, mules, cows, hogs, wagons and farming implements, worth from eight hundred to a thousand dollars, in payment of what he owed him for his services; he sold the other stock on the place and rented the farm of 280 acres to Josiah for $300 a year.   He then moved to the town of Clayton, and engaged in buying and selling stock, and later went into the saloon business.   In 1888 A. G. White was elected sheriff of Vernon county, for a term beginning January 1st, 1889, and John Johnson became one of the sureties on his official bond. White was re-elected in 1890, and John Johnson again became one of his ten sureties.   In March, 1891, John Johnson conveyed the farm to his wife, previously stating that he believed White, the bank and the country generally was going to default.   On the 9th of July, 1891, the Citizens Bank of Nevada made an assignment for the benefit of its creditors, and

it was then ascertained that White was financially ruined.   On the 21st of July, 1891, Johnson and wife conveyed the farm to his partner, John Gorse.   Johnson owed Gorse some three hundred dollars, but there was no arrangement between them that the conveyance was to be a security for the debt.   Josiah, the defendant, rented the farm from Gorse for the years 1892 and 1893, and paid him the three hundred dollars rent for 1892, which Gorse applied on the father's debt to him.   The Union National Bank of Kansas City  obtained judgment against John Johnson and John Vetters on May 6th, 1892, on a note for $1,100 made by them, and on or about the same day the assignee of the Citizens Bank of Nevada  obtained judgment against John Johnson  on his note for $300.   An execution was issued on the judgment in favor of the Union National Bank, and the Johnson farm and that of Vetters were sold and bought in on the 13th of December, 1892, by Neal, the vice-president of the bank and by him conveyed to the bank.   What was left of the personal property transferred by John Johnson to his son Josiah in 1887, and what Josiah had accumulated in the meantime, was also levied on.   Josiah claimed the property.   The bank then instituted a suit in equity against John and Josiah, returnable to the May term, 1893, to have the sale of the personal property from John to Josiah set aside, and to subject the property to the payment of the bank's claim.   On the 24th of June, 1893, Gorse conveyed the farm to Josiah but it was done wholly without Josiah's knowledge or consent, and the deed, though recorded, was never delivered to him.   During the taking of depositions in the case against John and Josiah to have the sale of the personal property set aside, an agreement was made between Josiah's attorney and the attorney for the bank, each having authority from his client, that Josiah should sell the stock and pay the judgment of the bank, and that the bank would convey the Johnson farm and the Vetters farm to Josiah. Accordingly Josiah sold the stock, paid the bank, and the bank

conveyed the property to him on September 30th, 1893, and Josiah transferred the Vetters farm to him. Subsequently an execution was issued on the judgment in favor of the Citizens Bank of Nevada, and the Johnson farm was levied on and sold on the 15th of February, 1895, the assignee becoming the purchaser for $25, and afterwards at the assignee's sale of the property of the assigned estate, the plaintiff bought the Johnson farm for $25. Thereupon this suit in equity was begun, against John, Josiah and Gorse, praying to have the deeds from John Johnson and wife to Gorse and from Gorse to Josiah Johnson set aside, and that Josiah be declared a trustee, with a resulting trust in John, and that the right, title and interest of both be divested out of them and vested in plaintiff. The answer of Josiah disclaimed title under the deed from Gorse and claimed title under the deed from the Union National Bank.

The trial in the circuit court resulted in a decree for defendant, Josiah Johnson, and after proper steps, the case was appealed to this court.

## I.

If the transfer of the personal property, in March, 1887, from John Johnson to his son Josiah, was *bona fide,* in payment of four years' services of the son, after he attained his majority, the title of Josiah to the land in controversy is indefeasible; otherwise it is fraudulent.

No claim is made that there was any legal impediment in the way of a valid transfer of his property by John Johnson, in March, 1887. He did not become surety on White's bond until January, 1889, and there is nothing in the record to show that any liability attached as surety on that bond during White's first term. His second term began January 1st, 1891, and although there is evidence that when the Citizens' bank failed in July, 1891, White was in trouble, it does not appear that Johnson or the other sureties were called on to respond

to their liabilities as such bondsmen.    It does not appear when
the $1,100 note held by the Union National Bank of Kansas
City was given, or when the $300 note to the Citizens Bank
of Nevada was executed. ·

       .    The plaintiff's principal reliance is upon the fact that
some time (the exact date is not stated) prior to March, 1891,
John Johnson told Clemens that White, the bank and the
country generally were "going to default;" that he stated to
other persons that the other sureties had covered up their
property and he intended doing the same thing; that he con-
veyed the farm to his wife in March, 1891; that twelve days
after the bank failed he and his wife conveyed the farm to
his partner, Gorse; that he told Bond he had to sell his stock
to pay the Union National Bank; that the assessments for
taxation for the year 1888, showed he owned $2,570 worth
of personal property, while Josiah only owned $50 worth, and
for 1889 he owned $940 worth, while Josiah only owned $80,
and for 1890, he owned $1,021 worth, while Josiah only
owned $78, while for 1891 he only owned $113, while Josiah
owned $1,033 worth; that on the trial of the case John ad-
mitted that he put the farm, first, in his wife's name, second,
in Gorse's name, and lastly in Josiah's name in order to defeat
the collection of his creditor's claims; and that on June 24th,
1893, Gorse conveyed the farm to Josiah.

       As against this showing on the part of the plaintiff, it
was proved by the defendant, that John was perfectly solvent
in 1887, and that he transferred the stock and other personal
property to Josiah, as payment for about four years' work
after he became of age, just as he had previously made pro-
vision of about the same value for his older sons, William and
John D.; that about the time of the transfer he rented the
farm to Josiah, moved into the town of Clayton and engaged
in business and never lived on the farm afterwards, but that
Josiah remained there, controlled the business, bought and
sold these and other cattle, kept a separate bank account from

at least as early as July, 1890, and prospered as a farmer and stock dealer; that Josiah never knew that Gorse had conveyed the farm to him, until during the proceedings in the suit by the Union National Bank against him to set aside the transfer of the personal property to him, and never had the deed or claimed under it, in fact laid no claim to the real estate until he purchased it from the Union National Bank; that the real estate was sold under the Union National Bank's execution on December 13th, 1892, and the conveyance from Gorse to Josiah was not made until June 24th, 1893; that the statements of John Johnson about covering up his property were not made in the presence or hearing or to the knowledge of Josiah; that Josiah made the arrangement to pay the judgment of the Union National Bank against his father and sold his stock and paid the $1,100 in order to get rid of the litigation and because he would thereby get a good title to the farm from the Union National Bank, and that the farm was worth more than the $1,100 he so paid the bank and the $1,200 mortgage that encumbered it, and hence there would be a profit to him, and he would not be injuring his father, who had already lost title to the farm by the sale to the bank; that he did not make return for the personal property for the years 1888, 1889 and 1890, because his father had done so before the assessor came to see him, and he did not think it made any difference in whose name the taxes were assessed as long as they were paid.

The transfer of the personal property by John to Josiah in March, 1887, was established by the positive, direct and unimpeached testimony of John Johnson, Josiah Johnson, and his brothers William, John D. and Charles, and also by the testimony of John Vetters, who owned and lived on the adjoining farm. The only countervailing testimony, if it can be called such, is that of M. S. Bond, who said that he and everybody thought the personal property on the farm belonged to John until the bank failed.

The father and all the sons were ably examined by plaintiff's counsel, and the testimony of the sons appears to be candid, straightforward and explicit and reads like it was truthful. The circumstances surrounding the original transfer are convincing that the transfer was *bona fide,* and as John was not in debt or contemplating going into debt at the time, that transfer was lawful. It was made over four years before the bank failed and about eight years before plaintiff acquired any right to question the transfer. The only circumstance that in anywise casts even a suspicion on the transfer of the personal property to Josiah, is the fact that the father was assessed for a large amount of personal property in 1888, 1889 and 1890, and the son was assessed for a small amount for those years, while for 1891 the son was assessed for a large amount, and the father was assessed for a small amount. This circumstance would be entitled to more weight were it not for the fact that the taxes for the year 1891 were assessed prior to July 9th, 1891, the day on which the bank failed, and are based upon property owned on the first of June, 1890, and on that day there appears no reason why the father should desire to cover up his property from his creditors, and in fact it does not affirmatively appear that he had any creditors at that time.

A careful and thorough examination of all the evidence taken and preserved in the record, with a full consideration of the very able brief and argument of plaintiff's counsel, leads this court to the same conclusion, as to the transfer of the personal property, in 1887, to Josiah, as that reached by the learned chancellor who tried the case below.

In all of its legal essentials this case falls within the rule so ably laid down by SHERWOOD, J., in Dozier v. Matson, 94 Mo. 328, and following that case, it results that Josiah was the owner of the personal property, and not being a party to or cognizant of any fraudulent intent on his father's part in making the several transfers of the farm, and not being aware of the deed of Gorse to him, and the Union National Bank

having a good legal title to the land, he had a right, when his title to the personal property was assailed by that bank, to compromise and settle that litigation by selling his personal property, paying the $1,100 to the bank and acquiring its title to the property, and to that formerly owned by John Vetters; and that he acquired in this way as good a title to the land as the Union National Bank had, and that title was superior to the title acquired by the assignee of the Citizens Bank of Nevada, on February 15th, 1895, and consequently superior to that acquired from the assignee by the plaintiff. It also follows that the circuit court did not err in excluding evidence as to the transfer of the Vetters property from Josiah to John Vetters, for, as above shown, Josiah acquired a good legal title to that as well as to his father's former farm, and hence had a right to give it to Vetters, if he saw fit to do so.

The decree of the circuit court was right and is affirmed. All concur.